[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-15527

_____

D.C. Docket No. 8:06-cr-00026-RAL-TBM-4


UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

WILLIAM ALLEN BROUGHTON,
a.k.a. W. Allen Broughton,
a.k.a. Allen Broughton,

Defendant - Appellant.

_____

No. 10-15536

_____

D.C. Docket No. 8:06-cr-00026-RAL-TBM-9


UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

RICHARD WILLIAM PETERSON,
a.k.a. Richard Snyder,
a.k.a. Dick Snyder,
a.k.a. Bob James,

                                        Defendant - Appellant.


                    _____

            Appeals from the United States District Court
                for the Middle District of Florida
                    _____

                    (August 10, 2012)

Before JORDAN, and FAY, Circuit Judges, and HOOD,[*] District Judge.

FAY, Circuit Judge:

    This criminal case involves sophisticated financial structuring through the

interplay of related corporate subsidiaries in the context of the insurance

business. While such financial structuring is not inherently improper, here the

two Appellants, William Allen Broughton ("Broughton") and Richard William

Peterson ("Peterson"), were convicted of conducting a modern-day financial

shell game in which they falsified financial statements, exchanged paper

ownership over non-extant fraudulent assets, and collected insurance premiums

---

[*] Honorable Joseph M. Hood, United States District Judge for the Eastern District of
Kentucky, sitting by designation.

2

and monthly payments from unwitting innocents.[1] We now have before us Appellants' consolidated appeals.

Collectively, they state two bases for reversal: (1) Broughton contends that the Government's purported failure to file charges within the relevant statutes of limitations demands reversal; and (2) both Appellants claim that the district court erred in denying their motions for judgment of acquittal due to an insufficiency of evidence. Finding no error, we affirm Appellants' convictions.

## I.

A Middle District of Florida grand jury returned the controlling indictment on January 17, 2006. The 27-page indictment contained two counts against ten defendants: Count I charged a conspiracy to commit (i) mail fraud, in violation of 18 U.S.C. § 1341, (ii) wire fraud, in violation of 18 U.S.C. § 1343, and (iii) insurance fraud, in violation of 18 U.S.C. § 1033(c)(1), all of which violated 18 U.S.C. § 371. Additionally, Count II charged a money-laundering conspiracy, in violation of 18 U.S.C. § 1956(h). In sum, the entirety of the indictment charged the defendants with engaging in a far-reaching conspiracy intended to benefit the individual members from the fraudulent capitalization of purported insurance

---

[1] Appellants, along with eight others, were indicted on these charges. Insomuch as those other individuals are relevant, they will be discussed below.

3

companies and related businesses.

The only pre-trial motions relevant to the appeal before us involved motions to dismiss the indictment filed by Broughton and other defendants in which they claimed the indictment was untimely. They argued that the relevant statute of limitations had expired prior to January 17, 2006, because the district court had improperly granted a motion to suspend the statute of limitations pending the receipt of evidence located in foreign jurisdictions.[2] The district

---

[2] The Government had sought and received a suspension of the controlling statutes of limitations in accordance with 18 U.S.C. § 3292, which permits, under certain circumstances, the suspension of a statute of limitations pending an official request for evidence to a foreign country where it reasonably appears that such evidence resides in the foreign country. 18 U.S.C. § 3292(a). Such a suspension may not endure beyond the time the foreign country takes final action, or, in any event, more than three years from the filing of the official request. 18 U.S.C. § 3292(b).

The Government's request was predicated on requests to two foreign countries: Costa Rica, and Panama. The first series of requests was directed to Costa Rica, when the Government sought the issuance by the district court of letters rogatory to Costa Rican judicial authorities. The Government filed that request with the district court on January 3, 2003. Therein, the Government identified evidence relevant to its criminal investigation of the financial fraud being investigated, including the request for certain business records from corporations and individuals implicated in the investigation. The district court granted that request four days later. Subsequently, the Government moved on July 21, 2003, to suspend the statute of limitations pending the outcome of those letters rogatory, pursuant to § 3292(a)(1). The district court granted the requested suspension. Soon afterwards, on July 23, 2003, the Government made a similar request to Panama, this time directly filing a request for information with Panamanian authorities. The Government subsequently filed a second motion for issuance of letters rogatory to Costa Rica on August 14, 2003, broadening the scope of its requested information. One year later, the Government sought and was granted a suspension of the pertinent statute of limitations pending the final outcome of their requests.

Neither Costa Rica nor Panama provided their final responses until 2005: Panama provided its final response on April 28, 2005, and Costa Rica did the same nearly seven months later on November 3, 2005.

court denied those motions.

Trial began on April 13, 2010. At the close of the Government's case, Broughton and Peterson moved for a judgment of acquittal on both counts of the indictment. The district court denied those motions, as well as the subsequent renewed motions. The trial finished on May 18, 2010, when the jury returned guilty verdicts as to Broughton and Peterson on both counts after 21 days of trial.

## II.

As we must, we consider the factual background in the light most favorable to the Government. See United States v. Glen-Archila, 677 F.2d 809, 818 (11th Cir. 1982). At trial, the Government provided evidence of the following.

For a little over two years beginning in 1996, the Internal Revenue Service conducted an undercover investigation into insurance fraud in the United States and overseas. In particular, the investigation was directed at individuals and corporations who marketed themselves as insurance providers on the basis of rented assets.[3] Such companies sought to collect insurance premiums while never

---

[3] As testified to by witnesses like Lynn Szymoniak and Belinda Miller, federal and state law requires that any company that wishes to provide insurance or credit backing on behalf of other companies in the United States must be licensed. To be licensed, a company must

5

intending to pay out on any meritorious claims. As will be discussed below, the undercover agents learned of numerous companies, some of which were operated by Appellants, that engaged in a conspiracy to operate in such a fashion.

However, the facts relevant to the appeal now before us extend beyond the confines of the undercover investigation. Therefore, we divide our discussion of the evidence at trial into two parts. First, we focus on the relationship between Appellants and the other co-conspirators leading up to and subsequent to the undercover investigation. Then, we turn to the fruits of the undercover operation itself.

## A.

At the center of the conspiracy to bilk innocent investors and would-be insureds were three people: Michael Ernest Zapetis, Sr. ("Zapetis"); his wife, Karen Carazo Zapetis ("Carazo"); and an individual named Richard Joseph Solomon ("Solomon"). In fact, Appellants' own actions and those of their four other indicted co-conspirators emanated like ripples in a pond from the fraud of

---

demonstrate that it has sufficient capital to meet its insurees' obligations and that it possesses sufficient capital reserves in the event of future claims. The types of capital that can legally be claimed by such insurance companies includes Treasury notes, certificates of deposit ("CDs"), stocks, and bonds. However, such capital can only be claimed as an asset on financial statements if it is owned and controlled by the claiming company. The IRS investigation sought to locate companies or people that purported to "rent" assets that they themselves may or may not have owned to others for inclusion on their own balance sheets as assets. This, of course, does not meet the requirements of the law.

6

Zapetis, Carazo, and Solomon.[4] We therefore begin our discussion with them.

Whether through purposeful direction or fortuitous criminality, the genesis of the fraud at issue was rooted in the overseas creation of fraudulent assets. Solomon, a self-employed business consultant, traveled to Panama in the early 1990s. There, he met with individuals operating a Panamanian cooperative acting as a credit union, Cooperative de Ahorro y Credito Gatun ("Gatun"). Solomon became a member of Gatun by depositing a small sum of money. Subsequently, he and those individuals, purportedly operating in an International Trust Division of Gatun, caused Gatun to issue hundreds of millions of dollars in CDs allegedly secured by billions of dollars of gold doré,[5] even though Solomon never confirmed the existence of that gold doré. No such gold doré in fact demonstrably existed. Even if it had existed, under Panama law issuance of such CDs would have still been illegal.

Soon after, Gatun was ordered in 1994 by the overseeing Panamanian agency to cease and desist issuing such CDs. Gatun, at Solomon's urging, did

---

[4] The evidence is unclear as to when Zapetis, Carazo, and Solomon met or began to plan their conspiracy. However, what is clear upon review of the evidence are the steps taken by each of those individuals in furtherance of that conspiracy. It is those steps which we now trace.

[5] Gold doré is a mélange in which low-grade rock and gold are poured into bars, which must contain at least 50% gold to qualify as gold doré. The gold doré is then used to create gold bullion or coins. It is also a well-know vehicle for fraud, as its form often defies accurate valuation.

not cease issuing fraudulent CDs. Ultimately, on or about February 23, 1996, the overseeing agency intervened in Gatun's business and took control of its operations, referring the many inquiries into the CDs that had been issued by Gatun to the relevant police and governmental authorities. Eventually, on June 22, 1997, the overseeing agency liquidated Gatun.

Meanwhile, the next step in the parties' business dealings involved the creation of companies to claim those fraudulent assets on their own balance sheets. Longtime residents of Miami, Zapetis and Carazo began acquiring off-shore companies in the early 1990s, naming those companies in a manner to suggest that they were involved in the insurance business. For example, Zapetis and Carazo formed and operated companies under names like American Indemnity Company, Ltd. ("American Indemnity"), Star Insurance Company ("Star Insurance"), and Global Insurance Company ("Global Insurance"), which were incorporated in St. Christopher and Nevis in the West Indies. They also formed certain Costa Rican subsidiary companies, like Capitales Uno de America, S.A. ("Cap Uno").[6]  To manage those companies, Zapetis and Carazo had another offshore company, Consorcio de Seguros Polaris, S.A.

---

[6] Other similar companies formed by Zapetis and Carazo included Capitales Tres de America, S.A. ("Cap Tres"), Capitales Seis de America, S.A. ("Cap Seis"), and Capitales Nueve de America, S.A. ("Cap Nueve").

8

("Consorcio"), which provided administrative services to the various companies in which Zapetis and Carazo had an interest. Additionally, Zapetis and Carazo owned and operated a company in Miami, Florida, which was known as First International Finance Corporation ("First International"), for which Zapetis and Carazo claimed to work as consultants.

To make it appear that their companies were capitalized, Zapetis and Carazo rented the Gatun CDs from Solomon. They paid Solomon rental fees for the use of the purported Gatun CDs, which they then listed on their own companies' financial statements, claiming ownership when in fact no such ownership existed. To conceal their fraud, Zapetis and Carazo obtained an audited financial statement of at least one company, American Indemnity, on the strength of the Gatun CDs. Even though that original audit opinion, dated December 15, 1995, was later withdrawn in May 1996 when the auditor learned that the Gatun CDs may have been in fact illiquid or nonexistent, Zapetis and Carazo nonetheless continued to market American Indemnity. Indeed, it was on this foundation of fraudulent capitalization that Zapetis and Carazo marketed their own companies to others for sale.

Zapetis and Carazo began selling some of those companies, as well as renting out the very same assets–the Gatun CDs–that they had rented from

9

Solomon.[7] For instance, Zapetis and Carazo sold interests in American Indemnity and its other companies, representing that they were subsidiaries of legitimate insurance companies with assets that could be rented for purposes of capitalization. In exchange for such sales and rentals, Zapetis and Carazo received preferred stock from the purchasing insurance companies, as well as a monthly rental payment greater than that which they paid to Solomon for the same purported assets, which they characterized as a "dividend." In the event one of the purchasing companies failed to make its monthly rental payment, the purchaser was stripped of its ownership of the alleged subsidiary as well as its ostensible ability to claim the Gatun CDs as assets on its own consolidated financial statements.

Appellant Peterson was one such purchaser of a fraudulent insurance subsidiary. He owned a cooperative known as the California Restaurant Specialty Cooperative ("CRSC"), located in San Francisco, California.[8] In the late fall of 1996 or early 1997, Peterson hired a man named James Stanley Connally —who later pled guilty to tax evasion and conspiring to commit wire,

---

[7] To turn a profit on those rentals, they would charge a higher rental rate than Solomon had originally charged them.

[8] In fact, other individuals were listed as nominal owners of CRSC to assist Peterson in obfuscating his own ownership. This was done because of Peterson's outstanding debts and financial difficulties.

mail, and insurance fraud, and testified for the Government at trial—to be the nominal head of CRSC.[9] In that capacity, Connally began marketing CRSC to agents in California, offering to sell to its members insurance products that would be provided by a third-party insurance company.

Soon afterwards, Peterson decided to purchase an insurance company that CRSC could itself own and operate. Connally, who had met Zapetis and Carazo previously,[10] believed that Zapetis and Carazo could provide a suitable offshore company for Peterson. When Connally contacted them, Zapetis and Carazo were indeed interested in selling such a company. On April 25, 1997, they provided Connally with an offer to sell Peterson Star Insurance for $225,000. Star Insurance purported to be a licensed insurance carrier in St. Kitts. Separate from the purchase price of $225,000 was also a $10,000 charge for an audit, which was to be conducted by "either Price, Waterhouse or Pannell, Kerr, & Forester in Antigua." Supporting the valuation of Star Insurance were its internal financial

---

[9] Peterson was put in touch with Connally through his attorney, John Heinemann. Explaining to Connally that he could not himself be president of CRSC because of his impending bankruptcy and previous difficulties with California insurance regulators, Peterson asked Connally to serve as the head of the insurance cooperative, to conceal Peterson's own involvement.

[10] Indeed, Connally had worked closely with Zapetis and Carazo to get a company approved to issue insurance through Lloyds of London, notwithstanding concerns over the company's capitalization. Once approved by Lloyds, that company underwrote some insurance contracts, although it refused to honor subsequent claims.

11

statements, audited by an individual CPA, that certified that Star Insurance's assets included $30 million in Gatun CDs owned by one of Star Insurance's subsidiaries, Cap Tres. There was no discussion of how a company with $30 million in assets could be sold for $225,000. Nonetheless, Peterson was not comfortable paying $225,000.

After some negotiations involving Peterson, Connally, Zapetis, and Carazo, Peterson purchased on May 2, 1997, a 45-day option on Star Insurance and Cap Tres for $10,000, as well as an audit of the same for an additional $10,000. Because Peterson wanted his role to be private, though, it was Connally rather than Peterson that signed the agreement with Zapetis and Carazo. To pay for the purchase, Peterson gave Connally a briefcase full of approximately $95,000 in cash so that there would be no paper trail leading back to Peterson. As to the remaining proceeds that were not used for the purchase of Star Insurance, some were used for Connally's salary, some for the marketing expenses of CRSC and Star Insurance, and some were to be deposited, on Peterson's instructions, in an CRSC account held at Charles Schwaab in $2,500 increments, so as not to "arouse any suspicion." Additionally, Connally flew to the Cayman Islands to secret approximately $10,000 of the cash for Peterson in a bedroom mattress located in a condo owned by Peterson. When doing as he was

12

instructed, Connally saw that "there was a lot of [other] cash under the mattress."

Meanwhile, Zapetis and his employees were seeking to purvey an audit of Star Insurance. After months of delay, the company that was to provide the audit, Peat Marwick, found that it could not verify the assets claimed by Star Insurance or Cap Tres. Indeed, as a result of their inability to verify those assets, Peat Marwick never provided an audit of Star Insurance.

Nonetheless, Peterson and Connally were not deterred in marketing Star Insurance as an insurance provider, notwithstanding that both Peterson and Connally knew Star Insurance possessed no assets, as it was required to do when participating in the insurance business. Instead, they marketed Star Insurance on the basis of the financial statement originally provided by Zapetis and Carazo, successfully marketing Star Insurance to a London insurance broker. Moreover, Star Insurance succeeded in underwriting reinsurance for such business concerns as marine insurance in Turkey and aviation concerns operating from Europe to North Africa. In fact, Peterson, using the alias "R. Snyder," corresponded concerning, approved, and signed many of the policies underwritten by Star Insurance. He used an alias because "he didn't want to show the Richard Peterson name anywhere based on his history."

Meanwhile, Appellant Broughton also had ties to Zapetis and Carazo's

13

fraudulent corporations. Broughton had known Zapetis since around 1982.

Zapetis assisted Broughton in starting his own companies and obtaining assets.

These companies included the Hanover-Packard Group, which owned Synergy

Capital Management ("Synergy Capital"), which in turn owned Financial Capital

Company of America ("Financial Capital").[11] Carazo, among other people,

served on the board of Synergy Capital with Broughton. Broughton also

recruited another man, Ralph Plummer–who later pled guilty to conspiracy to

commit fraud and testified for the Government at trial—to serve as the nominal

president of Synergy Capital. Zapetis also introduced Connally, the same man

who had served as the figurehead president of Peterson's insurance co-op, Star

Insurance, to Broughton.[12] Connally worked for Broughton and Financial Capital

for approximately four months, soliciting business for Financial Capital and

Synergy Capital.

Financial Capital purported to operate by guaranteeing that clients it

represented would repay loans, return capital, and pay interest due to investors

---

[11] Synergy Capital was a registered Delaware limited liability company operating out of Jackson, Mississippi, and Atlanta, Georgia. Financial Capital was a registered Nevada limited liability company and operated out of Atlanta, Georgia. Neither was licensed to perform insurance business in the United States or anywhere else.

[12] This introduction ultimately resulted in Connally leaving Peterson and Star Insurance to work with Broughton, Financial Capital, and Financial Capital's parent company, Synergy Capital.

14

and lenders. To satisfy those guarantees, Broughton claimed to have pooled together the resources of certain insurance companies, which he said stood ready to be called upon in the event of need. Some of those companies were owned and operated by Zapetis and Carazo. One such purported insurance company owned by Zapetis and Carazo was Cap Diez, which guaranteed it would accept a proportionate amount of Financial Capital's guaranteed liability in exchange for fees. In total, Broughton claimed that there were more than 35 other companies that guaranteed Financial Capital's debt obligations, all of which he marketed as possessing more than $5 million in capital. However, in correspondence with other associates, Broughton acknowledged that some of the companies participating in Financial Capital's debt obligations, particularly some of the ones provided by Zapetis and Carazo, in fact lacked sufficient assets and required assets to "be placed in them to qualify."

Nonetheless, Broughton and Synergy Capital entered into agreements with corporations to "support credit enhancement opportunities." Among other transactions between Broughton, Zapetis, and Carazo, in or around June 1997, Synergy Capital entered into an agreement with one of Zapetis and Carazo's Costa Rican companies, Inversiones Solidaris Americanis ("Inversiones"). Under that agreement, Inversiones provided Synergy Capital's subsidiary, Financial

15

Capital, with $250 million in financial guarantees in exchange for 24% interest in Synergy. The $250 million in financial guarantees derived from a CD issued by a purported Mexican financial institution, Factor Mex, which in turn was held by a Costa Rican bank. Those assets were never verified, in fact, to have existed. Nonetheless, Broughton testified that he personally believed those assets were genuine.

Similarly, Synergy Capital entered into an agreement with Eagle Telephony and Telecommunications ("ET&T") on or about December 9, 1997, in which ET&T agreed to assign $100 million in Treasury notes to Financial Capital, in exchange for 20% of all fees and profits of Financial Capital. ET&T was to lodge an assignment of the Treasury notes and other "documentation" in a bank outside of the United States. Under the terms of the agreement, the $100 million in Treasury notes was simply to be shown on Financial Capital's balance sheets without being "directly hypothecated." To accomplish the transfer of the $100 million in Treasury notes, ET&T's owner signed an "Irrevocable Stock or Bond Power" and a United States Treasury Form PD 1832, both of which purportedly assigned the Treasury notes to Financial Capital. However, in truth, the executed assignment and treasury forms were fraudulent, made to resemble a

16

real sale of a real Treasury note.[13]

Notwithstanding such deficiencies, Broughton obtained an unqualified audit opinion of Financial Capital's financial statements. The audit was performed by one of the co-defendants in this action, a certified public accountant named William Clancy. Clancy, in completing his audit, included the $250 million Factor Mex CD and the purported $100 million in Treasury notes from ET&T as assets on Financial Capital's financial statements. Broughton subsequently marketed Financial Capital and Synergy Capital, in part, on the basis of Clancy's fraudulent audit.

In fact, Broughton marketed both Financial Capital and Synergy Capital as being uniquely situated to assist businesses with "credit enhancement," claiming that Financial Capital and Synergy Capital would assist those companies by providing financial guarantees and "creative structur[es]" for their commercial ventures. Synergy Capital's sales brochure, for instance, trumpeted that Financial Capital had over $350 million in capital and that it was partnered with participating businesses that possessed over $1.4 billion in assets. Likewise, the

---

[13] As shown by the Government at trial, ET&T was never listed as owning the Treasury notes it purported to assign to Financial Capital and, regardless, Form 1832 was improper for transfer, since such a form was only applicable to owners of pre-1986 notes that sought to have their own debt instruments re-registered with the Government.

17

brochure detailed "a program of participation agreements/treaties with various cooperating companies under which they agree to share, on a pro-rata basis, the guarantee amount at risk." In particular, Financial Capital claimed that its own guarantees were insured by a Swiss insurance company, Roelofs Insurance Management, which was reinsured by Munich Re as well as by "a pool of reinsurers all rated by Standard & Poor's as A to AAA." None of these claims were, in fact, true.

Nonetheless, through at least March 2001, Zapetis, Carazo, and the other conspirators continued to market those guarantees for their own economic benefit. In one such instance, they guaranteed the actions of a company controlled by two individuals, Daniel DelPiano and Daniel Stetson, Premier Holidays International, Inc. ("Premier"). Premier claimed to be in the vacation time-share business and solicited investor loans. Utilizing the fraudulent guarantees provided by Financial Capital and Synergy Capital in December 1997, as well as others, Premier promised high rates of return in order to obtain private investment. In reliance on such guarantees and promises, investors invested money with Premier. For instance, one family invested $200,000; another $218,000; another $500,000; and another $1.5 million. Within each set of loan documents provided to its investors, Premier included a "Certificate of

18

Tender on Contingent Obligation," which was signed by Broughton or another representative of Financial Capital. In the Certificate of Tender, Financial Capital claimed that it "and its Participating Companies, re-insured with its group of Reinsurers: Scandia Re, Zurich Re, General Re, Munich RR, [and] AIG" guaranteed to repay any of Premier's debt in the event of default by Premier.[14]

Premier was, in fact, a Ponzi scheme. Eventually, in or around September 2000, Premier ceased interest payments to its investors, who subsequently sought to collect on Financial Capital's guarantees. As required by the loan documents that they had received from Premier and in reliance on the Certificate of Tender provided by Financial Capital, Premier's investors sent claims to Financial Capital and Synergy Capital. In response, from August 2000 through March 2001, Synergy Capital and Broughton sent those investors letters informing them that Financial Capital was working towards a resolution. For example, in a letter dated October 23, 2000, Broughton informed the Premier investors that Financial Capital—and Synergy Capital as the parent company of Financial

---

[14] Broughton paid Zapetis and Carazo's companies for their guarantees. On February 13, 1998, for instance, Broughton sent a check for $5,000 to one Zapetis/Carazo company. The same day Broughton deposited checks of $6,000 and $3,000 into Synergy Capital's own bank account, with both checks described as deriving from fee income related to Premier.

Capital—"accept[s] responsibility" for the obligations of Premier, and that Synergy Capital has agreed to "accept the responsibility to work out" those obligations. Several other similar letters were sent out to Premier's investors, informing them of the purported steps being taken by Synergy Capital. The final letter sent out to Premier's investors by Synergy Capital and signed by Broughton on March 13, 2001, stated that Synergy Capital was "very near finalizing the funding that will allow us to move forward in clearing the debt of [Premier] in a timely manner" and "anticipate[d] being in a position by the end of this month to begin those payments." No such payments were made.

## B.

As noted above, the IRS began undercover operations late in 1996, with several undercover agents posing as owners of an offshore insurance company known as Continental Indemnity, Ltd., which they wanted to capitalize with rented assets. The IRS's investigation resulted in recorded conversations and meetings with both Appellants, as well as with many of Appellants' co-conspirators like Connally, Zapetis, and Carazo. The undercover agents' point of entry into the conspiracy was Connally.

Soon before Connally began working with Financial Capital in early 1998, he was telephoned by a man referred to him by a Lloyds of London contact. The

20

man, identified as Mr. Tony Hicks, lived in Memphis, Tennessee. Hicks told Connally that there was a group of businessmen that were "wanting to start or find some assets." That group of businessmen was led by Barry Scoville, who told Connally that "he wanted to get some assets for his start up [insurance] company." Scoville told Connally that the company would be domiciled in Barbados. Over the course of approximately ten communications, Connally introduced Scoville to Zapetis, who he believed could provide the types of rental assets Scoville sought.

Soon afterwards, when Connally began working with Broughton and Financial Capital, Connally introduced Scoville to Broughton at the offices of Synergy Capital in Atlanta. On behalf of Broughton and his companies, Connally shared with the IRS agents Synergy Capital's marketing information, which included Clancy's unqualified audit opinion for Financial Capital. Connally told Scoville and one of Scoville's associates, identified as Mr. Scott Manning, that Broughton could provide different types of rented assets through his companies, Synergy Capital and Financial Capital. Particularly, he told them that both companies could provide both CDs and treasury notes as rented assets but that Treasury notes would cost more because they were more "credible." Also, Broughton explained the way in which transactions for rented assets could be

21

structured, having a subsidiary of an insurance company hold assets while having the insurance company issue preferred stock with a mandatory dividend payment. Under such a scheme, the asset's lender could reclaim those assets in the event of nonpayment of a dividend. Broughton admitted that he structured his own businesses in a similar fashion. Little did any of the conspirators know that Scoville and Manning were IRS undercover agents.

During recorded conversations between the undercover agents, Zapetis, Carazo, and an attorney named John E.S. Kramar ("Kramar"), who had been recommended to the agents by Connally, offered certain assets for rent from the Zapetis/Carazo companies. They offered to sell Cap Seis to the undercover agents, as well as to rent $10 million in assets with which it could be capitalized. They also proposed the way in which such a transaction could be completed with Continental Indemnity. Eventually, notwithstanding the urging of Kramar, Connally, and Clancy that there was a more effective way to conceal that the proposed assets were rented than that proposed by Zapetis and Carazo,[15] the undercover agents entered into contracts with Zapetis and Carazo for Continental Indemnity to rent the assets of some of his companies. By the terms of those

---

[15] For instance, they pointed to the way in which the financial statements of Synergy Capital and Star Insurance were structured, as well as the type of agreement entered into by Synergy Capital and ET&T.

22

contracts, the rented assets were "not to be hypothecated, loaned against, or used for any other purpose than as capital contribution to" Continental Indemnity. Both Connally and Kramar received $10,000 from Scoville for introducing him to Zapetis and Carazo.

During the course of their communications with the undercover agents, Zapetis and others discussed Appellants' own involvement with similar financial transactions. For instance, during one recorded telephone conversation, Zapetis told the undercover agents all about his relationship with Broughton. Claiming that they had done many deals together, where Broughton would lose money but would simply construct another deal, Zapetis described the way in which Broughton would structure his businesses, "get[ting] this huge overhead [] [where] he builds these pyramids and doesn't put the cement blocks in the right place all the time and the whole thing starts crumbling." Zapetis also informed an IRS undercover agent in early 1999 that Broughton was at it again, this time providing financial guarantees to builders.

In a similar vein and at a later time, Connally referred the undercover agents to "Richard Snyder," the alias being used by Peterson, for administration of Continental Indemnity. Connally told the agents that Peterson would keep all their business dealings confidential in exchange for a monthly fee for his

23

services. In fact, when agents contacted Peterson as per Connally's suggestion, Peterson was more than willing to help.[16] The agents explained to him that Continental Indemnity had more than $10 million in rented assets, costing them more than $40,000 each month in rent, and that they needed someone else to manage the administration of Continental's records. Peterson said that he had dealt with such record-keeping in the past with such companies as Star Insurance and that he would keep an eye out for problems that could be avoided by "cancel[ing]" those rented assets.

## III.

Now, we have before us two bases for reversal. First, Appellant Broughton, in an argument in which Appellant Peterson does not join, contends that the January 17, 2006 indictment is barred by the applicable statute of limitations and that the district court erred in denying his motion to dismiss on that basis. Specifically, Broughton argues 1) that the statute of limitations was improperly suspended under 18 U.S.C § 3292; and 2) that because a five-year statute of limitations applies to both counts of the indictment, any alleged conspiracy was completed long before the return of the January 17, 2006

---

[16] During his communications with the officers, Peterson referred to himself only as "Richard Snyder." In fact, it was not until agents attempted to serve a grand jury subpoena on him that he admitted to being Richard Peterson.

24

indictment. Like the district court before us,[17] we find no merit in Broughton's

first contention. Nor do we discern any more merit in Broughton's second

contention, which is mooted by our finding that the indictment was filed within

five years of the ongoing conspiracy.

"Denials of motions to dismiss the indictment are reviewed for abuse of

discretion, but underlying legal errors . . . are reviewed de novo." United States

v. Robison, 505 F.3d 1208, 1225 n.24 (11th Cir. 2007) (citations omitted).

## A.

As a threshold matter, we first address whether the district court properly

suspended the running of the statute of limitations. We have previously noted

that "[w]here there is a question of statutory interpretation, 'we begin by

examining the text of the statute to determine whether its meaning is clear.'"

United States v. Trainor, 376 F.3d 1325, 1330 (11th Cir. 2004) (quoting Harry v.

Marchant, 291 F.3d 767, 770 (11th Cir.2002) (en banc)). "Indeed, '[i]n

construing a statute we must begin, and often should end as well, with the

language of the statute itself.'"  Id. (quoting United States v. Steele, 147 F.3d

---

[17] The district court held that the statute of limitations was properly suspended pending the final responses of Costa Rica and Panama; that a ten-year statute of limitations applied to insurance fraud as charged in Count I; and that, even if the limitation period was five years, the indictment was nonetheless timely filed.

1316, 1318 (11th Cir. 1998) (en banc)).

18 U.S.C. § 3292 provides that:

Upon application of the United States, filed before return of an indictment, indicating that evidence of an offense is in a foreign country, the district court before which a grand jury is impaneled to investigate the offense shall suspend the running of the statute of limitations for the offense if the court finds by a preponderance of the evidence that an official request has been made for such evidence and that it reasonably appears, or reasonably appeared at the time the request was made, that such evidence is, or was, in such foreign country.

Id. at § 3292(a). A plain reading of § 3292 demonstrates that a district court's decision to suspend the running of a statute of limitations is limited to two considerations: 1) whether an official request was made; and 2) whether that official request was made for evidence that reasonably appears to be in the country to which the request was made. Id. If both those considerations are met, the statute of limitations "shall" be suspended. Id. Therefore, the issue before us is whether those conditions were satisfied.

Broughton contends that the Government did not satisfy these requirements, since

(1) the commission and completion of both alleged conspiracies were fully known to the Government before it made the application to the trial court pursuant to 18 U.S.C. § 3292,
(2) both conspiracies had terminated, or the final acts in furtherance of the conspiracy had occurred, prior to the Government's

26

application to the trial court, and
(3) none of the evidence requested or obtained by the Government from any foreign country as included in the Government's application was necessary and sufficient or relevant.

App. Broughton Br. at 19-20.

We find no support, either in our case law or in the facts of the case, for any of Broughton's stated contentions. Our case law demonstrates that § 3292 is a procedural mechanism that may be used by the government under certain circumstances and that a district court's inquiry is constrained by the boundaries of the two elements required by § 3292. One of our cases, Trainor, evinces this principle.

In Trainor, the government had sent an official request to the Ministry of Justice in Switzerland, requesting certain information related to an ongoing SEC investigation into the defendant's actions. Trainor, 376 F.3d at 1328. Six months later, the government filed a motion in the district court to suspend the pertinent statute of limitations pending Switzerland's final action. Id. at 1329. The government filed with its motion no evidentiary support that could demonstrate that "it reasonably appears, or reasonably appeared at the time the request was made, that such evidence is, or was, in such foreign country." § 3292(a). Nonetheless, the district court granted the suspension. Trainor, 376 F.3d at 1329.

27

When the indictment was returned nearly one year after the government's official request to Switzerland, the criminal case was subsequently assigned to a different judge. Id. The defendant again moved to dismiss the indictment as untimely because the government had not satisfied § 3292(a) in requesting the suspension of the statute of limitations. Id. at 1329. This time, the district court agreed with the defendant, finding that "the [g]overnment did not present the district court with any evidence to satisfy the preponderance of the evidence standard set out in 18 U.S.C. § 3292." Id. The government appealed, arguing that its unsworn application to the district court, "accompanied by only a copy of an evidentiary request sent to a foreign government, satisfies § 3292's requirement that the [g]overnment demonstrate, by a preponderance of the evidence, that evidence concerning the charged offense reasonably appears to be located in the foreign country." Id. at 1327.

We disagreed, holding that a motion to suspend a statute of limitations must be accompanied by "something with evidentiary value–that is, testimony, documents, proffers, and other submissions bearing some indicia of reliability–tending to prove that it is reasonably likely that evidence of the charged offense is in a foreign country." Id. at 1332. In that case, the government had failed to provide anything "of evidentiary value for the district court to

28

evaluate." Id. at 1333 (citing DeGeorge v. United States Dist. Ct. for the S. Dist. Of Cal., 219 F.3d 930, 937 (9th Cir. 2000)).

Implicit in our holding in Trainor was our realization that the district court must assess and weigh both the evidence sought in the foreign jurisdiction and the information proffered by the government in pursuit of that foreign evidence. See id. at 1331-32. The district court makes this determination as part of its consideration of whether the government has met the requirements of § 3292(a) in seeking a suspension. Otherwise, there would be no need for the government to provide any evidence at all in support of its application for suspension of a statute of limitations under § 3292(a). Here, it is clear that both prongs were satisfied by the Government's request.

First, as to the requirement that "an official request has been made for such evidence," §3292(a), there can be no doubt that the Government's requests here comply. As defined by § 3292, a request qualifies as an "official request" if it is "a letter rogatory, a request under a treaty or convention, or any other request for evidence made by a court of the United States or an authority of the United States having criminal law enforcement responsibility, to a court or other authority of a foreign country." § 3292(d). The Government's requests to both Costa Rica and Panama qualify under this standard. As was noted above, supra,

29

the Government's first request was filed with the district court as a motion for issuance of letters rogatory to Costa Rica on January 3, 2003, and asked that proper Costa Rican authorities search the offices of American Indemnity and Star Insurance, and turn over the bank records for such companies as American Indemnity and others associated with Broughton, Peterson, and Zapetis. Similarly, the Government submitted a request to Panama on July 23, 2003, requesting information regarding Co-op Gatun. Both the letters rogatory to Costa Rica and the request to Panama for evidence necessarily qualify as "official requests" under § 3292(d).

Moreover, the district court also properly found that the second requirement of § 3292 was satisfied because it "reasonably appears, or reasonably appeared at the time the request was made, that such evidence is, or was, in such foreign country." § 3292(a). The Government's initial request to Costa Rica—which, being the first such request is the only one relevant to whether the statute of limitations was properly suspended—was made on the basis of a sworn declaration by an Assistant United States Attorney, declaring the extent of the investigation into the fraudulent activities at issue and affirming the need for the discovery of certain information in Costa Rica. This declaration satisfies our explicit requirement under Trainor. See Trainor, 376 F.3d at 1335.

30

It also satisfies the implicit requirement of relevance and reasonableness incorporated within § 3292. The Government's initial request to Costa Rica was found in the contemporaneously filed 22-page proposed "International Letter Rogatory," in which the Government noted the extent of the criminal conspiracy and the necessity of certain information found only in Costa Rica. Review of that International Letter Rogatory demonstrates the narrowly tailored evidence sought by the Government, the relevance of that evidence to an ongoing criminal investigation, and the propriety of the request itself.

Simply put, Broughton's perceived shortcomings regarding the suspension of the statute of limitations here are not only nowhere to be found in § 3292(a), but also contrary to the idea of prosecutorial discretion. It is neither here nor there that the Government knew of the conspiracy before sending its official requests to Costa Rica and Panama; that the conspiracy had terminated before the Government requested the statute of limitations be tolled; or that "none of the evidence requested or obtained by the Government" was needed at trial. Accord United States v. Lyttle, 667 F.3d 220, 225 (2d Cir. 2012) ("Section 3292 does not demand that the foreign evidence sought be pivotal to the indictment; rather, it need only be 'evidence of an offense.' Grand juries are not required to vote on indictments as soon as they have probable cause: 'A grand jury investigation is

31

not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed.' Section 3292 does not alter this long-standing precept, but rather facilitates it by providing a means to suspend the statute of limitations while evidence is sought from abroad.") (internal citations omitted)).  Surely each of those considerations, like other pre-trial concerns, is entrusted to the prosecutor's discretion and the district court's oversight.

Accordingly, having found that both factors of § 3292(a) were satisfied, we find that the district court properly granted the suspension of the relevant statute of limitations.

## B.

We now turn to whether, even with that suspension of the statute of limitations, the action filed against Broughton was timely. He urges us to find that a five-year statute of limitations, rather than a ten-year statute of limitations as argued by the Government, controlled the relevant criminal actions, and that any conspiracy had reached fruition in 1999, meaning that the January 17, 2006, indictment was necessarily untimely if applying a five-year limitations period.

32

We need not address the duration of the controlling statute of limitations,[18] since we find that the conspiracy at issue continued through March 2001 and therefore the January 17, 2006 indictment was filed before the expiration of even the five-year statute of limitations.

Although Broughton contends that his criminal conduct was "largely completed" as of February 24, 1999, when the Government seized his records, a plain reading of the placatory language employed by Broughton in letters to Premier's investors demonstrates otherwise. As the district court initially concluded, Broughton's letters under Synergy Capital's letterhead were

> intended to assuage the concerns of victim-investors by persuading them that Synergy was expending every effort to compensate the victim-investors for their losses, encourage the victim-investors to contact Synergy, and exercise continued patience with Synergy – in other words, lull them into a false sense of security and discourage them from contacting law enforcement or other authorities.

Order, Mar. 11, 2010, ECF No. 504 at 5. He wrote and signed those letters as the Managing Director of Synergy Capital, the parent company of Financial Capital, and it is reasonable that the jury would have found those letters to be a continuing execution of a conspiracy to defraud. Accord United States v. Evans,

---

[18] The district court found the applicable limitations period was ten years because of the ten-year limitation period for insurance fraud under 18 U.S.C. § 3293, while Broughton argued instead that the charge was controlled by the five-year periods for conspiracy to commit mail fraud, wire fraud, and money laundering under 18 U.S.C. § 3282.

473 F.3d 1115, 1121 (11th Cir. 2006) (finding lulling doctrine applicable where letter sent after fruits of fraud received by defendant constituted continuation of original scheme to defraud); see also United States v. Georgalis, 631 F.2d 1199, 1204 (5th Cir. 1980) ("[P]recedent is clear that letters designed to conceal a fraud, by lulling a victim into inaction, constitute a continuation of the original scheme to defraud.").[19] This would mean that the conspiracy did not reach fruition until March 13, 2001, when he sent his final letter.

Regardless, even if Broughton was correct and the conspiracy could have been said to have ended when the Government seized his records on February 24, 1999, the Government would have had at least five years from that time to bring its charges. Therefore, any charges would have been needed to be brought before February 24, 2004. However, as noted above, supra, the statute of limitations was suspended from the time of the first official request under § 3292 on January 3, 2003, at which point approximately 13 months would have remained of the five-year statute of limitations period. § 3292(b) ("[A] period of suspension under this section shall begin on the date on which the official request is made and end on the date on which the foreign court or authority takes

---

[19] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted all Fifth Circuit case law decided prior to October 1, 1981.

final action on the request."). It was suspended through November 3, 2005, with the final action of Panama. Id. Therefore, the Government had approximately 13 months from November 3, 2005, to bring its charges. It filed the indictment a mere two-and-a-half months later on January 17, 2006.

On the evidence before us, we therefore see no reason to disturb the district court's ruling. No matter how you cut it, the January 17, 2006 indictment was timely under a correct application of § 3292.

**IV.**

We now turn to the error alleged by both Appellants. They contend that the district court erred in denying their respective motions for acquittal as to both counts of the indictment because of insufficient evidence to support the charges.

We review de novo the denial of a motion for judgment of acquittal, and in reviewing the sufficiency of the evidence underlying a conviction, we consider the evidence "in the light most favorable to the government, with all inferences and credibility choices drawn in the government's favor." United States v. DuBose, 598 F.3d 726, 729 (11th Cir. 2010) (quoting United States v. LeCroy, 441 F.3d 914, 924 (11th Cir. 2006)). Therefore, our review for sufficiency of the evidence inquires only whether a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt. United States v. Godinez,

35

922 F.2d 752, 755 (11th Cir. 1991). "The question is whether reasonable minds could have found guilt beyond a reasonable doubt, not whether reasonable minds must have found guilt beyond a reasonable doubt." United States v. Bacon, 598 F.3d 772, 775 (11th Cir. 2010) (quoting United States v. Ellisor, 522 F.3d 1255, 1271 (11th Cir. 2008)) (emphasis in original omitted). Accordingly,

> [i]t is not necessary for the evidence to exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt . . . . The jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial, and the court must accept all reasonable inferences and credibility determinations made by the jury.

United States v. Garcia, 447 F.3d 1327, 1334 (11th Cir. 2006) (internal quotations and citations omitted). We are "bound by the jury's credibility choices, and by its rejection of the inferences raised by the defendant." United States v. Peters, 403 F.3d 1263, 1268 (11th Cir. 2005) (citing United States v. Glinton, 154 F.3d 1245, 1258 (11th Cir. 1998)). In accordance with these collective limitations and upon review of the record, there is no doubt that sufficient evidence supported the jury's findings as to both Appellants. As such, the district court properly denied their motions for acquittal.

## A.

Count I of the indictment charges Appellants with conspiracy to commit

36

mail fraud, wire fraud, and insurance fraud. There are three elements for proof of such a conspiracy: (1) agreement between two or more persons to achieve an unlawful objective; (2) knowing and voluntary participation in that agreement by the defendant; and (3) an overt act in furtherance of the agreement. United States v. Adkinson, 158 F.3d 1147, 1153 (11th Cir. 1998). As we noted in United States v. Hasson, 333 F.3d 1264, 1270 (11th Cir. 2003) (citing United States v. Ross, 131 F.3d 970, 981 (11th Cir. 1997); United States v. Smith, 934 F.2d 270, 275 (11th Cir. 1991)) ,

> [t]o prove a conspiracy to commit wire fraud, the government need not demonstrate an agreement specifically to use the interstate wires to further the scheme to defraud; it is enough to prove that the defendant knowingly and voluntarily agreed to participate in a scheme to defraud and that the use of the interstate wires in furtherance of the scheme was reasonably foreseeable.

We will address each Appellant's arguments individually.

## 1.

As to Count I's charge of conspiracy to commit mail, wire, and insurance fraud in violation of 18 U.S.C. § 371, Broughton argues that the Government provided insufficient evidence that 1) he conspired to achieve an unlawful objective or his voluntary participation in such a scheme, 2) that Financial Capital's financial statements were relied upon by any of Premier's investors, 3)

37

that the Gatun CDs were worthless, or 4) that any of the participating companies had been fraudulently capitalized.

Furthermore, arguing the Government's theory was that Broughton "had issued fraudulent financial guarantees and . . . offered bogus assets for rent to enhance capitalization for certain companies," Broughton counters that the Government provided no evidence of such allegations. Instead, he claims that the Government failed to provide evidence that "he [had] rented bogus assets to capitalize his own two companies," or that those companies were improperly capitalized by the ET&T Treasury notes or the Factor Mex CDs. Similarly, Broughton claims that Financial Capital's guarantees were not provided to Premier's investors to demonstrate Financial Capital's own assets, but instead the insurance provided by Roelofs Insurance. As such, Broughton's claim rests upon his argument that mere issuance of financial guarantees by Financial Capital and Synergy Capital under his signature cannot demonstrate knowing participation in a scheme to defraud Premier's investors. Broughton's contentions, however, are undermined by the nature of Financial Capital's guarantees, his communication with Premier's investors, and his communications with his co-conspirators.

The evidence at trial demonstrated the purpose and reach of Financial

38

Capital. It was a company designed to lure innocent individuals and investors by purporting to provide financial guarantees. In truth, though, the financial guarantees it made were not worth the paper they were written on, as Financial Capital itself possessed no assets, as testified to by both Connally and Plummer. Nor did the companies claimed by Financial Capital and Broughton as participants, many of which were predicated on false financials concocted by Zapetis and Carazo, possess any assets that could be used to satisfy those financial guarantees. These facts were testified to, at length, by both Connally and Plummer. Such testimony is sufficient to have established Broughton's knowledge of the nature of the conspiracy at issue. United States v. Allison, 908 F.2d 1531, 1533-34 (11th Cir. 1990) ("There is little doubt that a co-conspirator's statements could themselves be probative of the existence of a conspiracy and the participation of the defendant and the declarant in the conspiracy.") (quoting Bourjaily v. United States, 483 U.S. 171, 180 (1987)).

Indeed, it is fair to say that Financial Capital was set up to take money in, but not to pay any out. Proof of this can be seen even in agreements entered into between Broughton and Zapetis. For example, when entering into its agreement with Inversiones, Financial Capital mandated numerous steps that had to be taken in the event an individual demanded payment on the Financial Capital

39

guarantees. Such steps included drawing upon a Financial Capital reserve account that did not, in fact, exist; calling on participating companies to contribute on a pro-rata share, notwithstanding the known under-capitalization of those companies; gaining financing on Financial Capital assets, which were actually inflated to appear greater than they were; and reinsurance, which even an employee of Financial Capital like Plummer testified he had never been able to verify existed. Financial Capital's financial health was designed to be dependent on such fallacies, for it was only by avoiding payments that it could conceal its lack of capital assets.

If there were any doubts about Broughton's state of mind and his knowledge of Financial Capital's fraud, they would quickly be dispelled upon consideration of the IRS's undercover investigation. In recorded conversations that were provided to the jury, Broughton explained the way in which financial statements could be manipulated to make it appear that purported insurance companies possessed far more assets than they in fact did. Such conversations were intended by Broughton to convince the undercover agents that their purported company, Continental Indemnity, could function similarly to his own companies, Financial Capital and Synergy Capital. Those conversations could have reasonably been relied upon by the jury in determining Broughton's own

40

intent in establishing and operating Financial Capital and Synergy Capital.

As a final matter, because Broughton elected to testify in his own defense, the jury was entitled to make its own credibility determinations regarding Broughton's testimony and demeanor. United States v. Brown, 53 F.3d 312, 314 (11th Cir. 1995). Broughton testified that he never paid "Michael Zapetis, Karen Carazo Zapetis, or any of their companies or employees any money in exchange for the use of CDs or other capital assets." He testified that he never knew Richard Peterson nor Richard Solomon. He also testified regarding the assets claimed by Financial Capital, the participating companies in Financial Capital's guarantees, and that, when assets were assigned to Financial Capital and Synergy, "they would be an asset of the company, and according to the formula of a call . . . [Financial Capital and Synergy Capital] could hypothecate them to borrow money." Moreover, he disavowed any knowledge of fraud or fraudulent intent, speaking specifically to the letters he sent out to Premier's investors. He testified that those letters were not intended "to lull [Premier's] investors to take no action about their investments." Such was his right.

However, in finding Broughton guilty, the jury necessarily found Broughton to be not credible and, presumably, discounted or disbelieved his testimony. Such was its right, Brown, 53 F.3d at 314, especially in light of the

41

substantial evidence to the contrary introduced by the Government.

Accordingly, given the entirety of the evidence put forth before the jury, we have no difficulty in affirming the district court's denial of Broughton's motion for acquittal on Count I.

**2.**

Like Broughton, Peterson argued that his motion to acquit should have been granted due to the insufficiency of evidence relating to Count I. His primary contention is that the insurance cooperative was legitimate and that there was insufficient evidence that he had knowledge of fraud.

Consideration of the underlying evidence in conjunction with the required elements that had to be proven at trial compels us to deny Peterson's argument. There is simply no dispute that Peterson, with the help of Connally, purchased an offshore corporation, Star Insurance, from Zapetis, as well as its subsidiary, Cap Tres. Nor is there any dispute that he funded those corporations with assets rented from Zapetis and Carazo, namely the Gatun CDs. In fact, once it was up and running with its fraudulently capitalized assets reflected on its balance sheet, Star Insurance underwrote insurance coverage and collected premiums, never having the assets necessary to satisfy any claims that might have been filed.

Moreover, there was ample circumstantial evidence from which the trier of

42

fact could have concluded that there were insufficient assets. Most obviously, he purported to purchase a company that allegedly had $30 million in assets for less than one percent of those assets' value. Such a sale defies logic and undermines any claim of innocence.

Moreover, Peterson sought to cover his tracks. Whether it was through his purchase of the initial option on Star Insurance by handing Connally a briefcase full of hundred dollar bills; his appointment of Connally to be the nominal head of the company because of the difficulties Peterson had previously had with California regulators; or his underwriting of insurance policies for Star Insurance under the alias of "Richard Snyder," these actions can be understood as circumstantial evidence that he knowingly participated in the conspiracy to defraud and was aware of the illegitimate nature of, at least, Star Insurance. See United States v. Gold, 743 F.2d 800, 825 (11th Cir. 1984) (quoting United States v. Freeman, 498 F.2d 569, 576 (2d Cir. 1974) (holding efforts to conceal a conspiracy may support the inference that defendant knew of the conspiracy and joined while it was in operation).

Even more compellingly, Peterson's interactions with the undercover agents demonstrate Peterson's knowledge of the fraud in which he was involved. After being put in touch with the undercover agents by Connally, Peterson told

43

the agents that he would handle their record keeping in relation to the company the undercover agents had set up with Zapetis and capitalized with the same rented assets as those used by Peterson himself. He evidenced his understanding of the nature of those assets when he informed the undercover agents that he would keep an eye on those assets and be prepared to advise about cancellation. Moreover, he made clear that this type of management was something he was accustomed to doing with his own company, Star Insurance.

Such evidence is sufficient to demonstrate that CRSC and Star Insurance were illegitimate, and that Peterson, as their real owner, knowingly directed those companies' fraudulent actions. Accordingly, we deny Peterson's appeal as to Count I.

**B.**

Finally, we turn to Appellants' contentions regarding Count II. Unlike the statute upon which conspiracy charge in Count I is based, which required an overt act be committed during the course of the conspiracy, Count II has no such requirement. Instead, under 18 U.S.C. § 1956(h), only two elements of a conspiracy need be proven: (1) agreement between two or more persons to commit a money-laundering offense; and (2) knowing and voluntary participation in that agreement by the defendant. United States v. Johnson, 440

44

F.3d 1286, 1294 (11th Cir. 2006). Count II alleged that Broughton and Peterson, among others, had conspired to commit a money laundering offense, in violation of 18 U.S.C.

§ 1956(a)(2)(B)(I). The defendants were charged with doing so by

> . . . transport[ing], transmit[ting], and transfer[ring], and attempt[ing] to transport, transmit, and transfer funds from a place in the United States to and through a place outside the United States and to a place in the United States from or through a place outside the United States, knowing that the funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmission, and transfer was designed, in whole and in part, to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity . . .

The specified unlawful activity was identified as mail and wire fraud, committed in violation of 18 U.S.C. §§ 1341 and 1343. Count II further avers that, in violation of 18 U.S.C. § 1957, they did also "knowingly engage and attempt to engage in monetary transactions within the United States, affecting interstate commerce, in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity," again, mail and wire fraud, committed in violation of 18 U.S.C. §§ 1341 and 1343.

As with our discussion of Count I, we will address each Appellant's contentions regarding Count II individually.

45

**1.**

Broughton's primary contention regarding the sufficiency of evidence in support of Count II is that the Government did not introduce evidence that any of the payments made by Broughton were made with funds illegally obtained or were made to carry out mail and wire fraud. Instead, Broughton argues that there was an insufficient showing "that the $5,000 check sent by Mr. Broughton from the United States to Consorcio was for any reason other than preparing 14 participation agreements . . . . [or that] the $50,000 payment to [ET&T] as part of the agreement for the United States treasury notes was a monetary transaction with a financial institution or that the $50,000 was derived from a specified criminal activity."

We disagree. Having already noted the extensive evidence supporting Broughton's involvement in a conspiracy to commit mail fraud, wire fraud, and insurance fraud, we find further evidence of Broughton's involvement in a conspiracy to launder the proceeds of the fraudulent transactions in which Broughton engaged.  Broughton derived income from the fraudulent activities of Financial Capital and Synergy Capital, and reinvested at least a portion of that income in the ongoing conspiracy of which he was but one part. Evidence at trial showed, for example, some of the fees Financial Capital generated from its

46

guarantee of Premier. The evidence also showed that payments were made between Broughton, Zapetis, and Carazo, referencing Premier as the source of the income for those payments. Additionally, Broughton's former employee, Plummer, testified that a $45,000 check written by Synergy Capital to ET&T, signed by Broughton, was "written to pay for" the purported $100 million in Treasury bills claimed by Synergy Capital. Notwithstanding Broughton's testimony to the contrary, there was sufficient evidence from which a reasonable juror could conclude that Broughton knew the fraudulent nature of his actions and willingly participated in the conspiracy to launder money between the many corporations operated by himself, Zapetis, Carazo, and others.

This cumulative evidence was certainly sufficient to support a conviction for the offense of conspiring to commit money laundering. Therefore, a jury was certainly entitled to find that both elements for this type of conspiracy were satisfied by the Government's proof. Our case law requires nothing further, notwithstanding Broughton's contentions to the contrary.

**2.**

Finally, we now turn to Peterson's argument regarding Count II. He claims both that he lacked specific intent to have committed a money laundering offense under Count II, and that the driving force of any such actions were taken not by

47

Peterson himself, but by Connally.

As a threshold matter, we interpret Peterson's argument as conceding that a conspiracy to launder money took place but disputing whether he himself possessed the specific intent to have participated as required by 18 U.S.C. § 1956(a)(1)(A)(1). As such, we need not retread proof of a money-laundering operation involving Zapetis, Carazo, and the other conspirators. Instead, we need only address the evidence insomuch as it demonstrates specific intent on Peterson's part to engage in that money-laundering operation.

Ample evidence of that specific intent exists. Connally, on Peterson's behalf, transported cash to the Cayman Islands, deposited small sums of cash in American banks to avoid detection, and generally sought to transport cash away from the domain of the United States. Connally testified that Peterson directed him to take these actions, and that when he did, he found that, as in the case of the cash stuffed under the mattress in the Cayman Islands, he was not the first to have taken such actions.

Equally meritless is Peterson's contention that he was an unwitting pawn in Connally's game. While the evidence certainly supports the contention that Connally was involved in the fraudulent actions at issue, it was Peterson who assumed an alias to underwrite insurance contracts; it was Peterson who agreed

48

with Zapetis and Carazo to purchase Star Insurance and to rent assets over which Star Insurance had no right to claim ownership; and it was Peterson who rented those assets on behalf of the company he controlled behind the scenes.

We reject Peterson's reliance on cases like United States v. Seher, 562 F.3d 1344 (11th Cir. 2009). There, in the context of a drug conspiracy, we upheld the sufficiency of the evidence at trial to affirm a conviction for money laundering. Id. at 1364-65. Peterson now claims that the evidence relevant to his own knowledge of the money laundering conspiracy at issue in this case is significantly less convincing than in Seher. Without passing on the merit of that contention, we note that Peterson does not argue that there is no evidence; he only says that "[c]omparing the instant case to the Seher case, it is clear that any evidence that can be adduced against Peterson is minimal." App. Peterson Br. at 40. However "minimal" Peterson considers the above evidence to be, we have no doubt that it is nonetheless sufficient for a jury to have found Peterson guilty of Count II. Accordingly, the district court properly denied his motion to acquit because of an insufficiency of evidence.

**V.**

Having exhaustively reviewed the record and entertained oral argument, we deny Appellants' alleged errors and **AFFIRM** their convictions.

49