[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 23-13913

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

ARTURS SPILA,
a.k.a. Arturs Clare,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:21-cr-00375-MLB-JEM-3

_____

Before WILLIAM PRYOR, Chief Judge, and GRANT and KIDD, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

This appeal requires us to decide whether sufficient evidence supported a conviction for conspiracy to commit money laundering. 18 U.S.C. § 1956(h). Arturs Spila, an alien, entered the United States in May 2018. Over the next three months, he deposited hundreds of thousands of dollars in cash in three separate bank accounts. The cash came from a scheme in which fraudsters hired people for fake work-from-home positions. As one of their first assignments, the new hires cashed checks made payable to them and mailed the cash to Spila's address. The fraudulent checks inevitably bounced, but the victims' purported employers never paid or reimbursed them. And when Spila received the cash, he deposited it in his accounts. He then wired over $200,000 from those accounts in small transactions, mostly to international recipients. A jury convicted Spila of conspiracy to commit money laundering. Because sufficient evidence supported Spila's conviction and he fails to identify any reversible error, we affirm.

## I. BACKGROUND

On May 23, 2018, Arturs Spila, a Latvian national, arrived in the United States. Upon his arrival, Customs and Border Protection officers interviewed and screened him. Spila told the officers that he was on vacation and showed them a return airline ticket for June 6. But Spila did not board that flight. Instead, he stayed in the United States until August 14.

During his stay in the United States, Spila opened three personal bank accounts—two within days of his arrival. He initially reported his home address as 2052 South Hobart Boulevard, Los Angeles, California, but later updated the address associated with all three bank accounts to 1538 North Martel Avenue, Apartment 411, Los Angeles, California.

Meanwhile, several people across the country fell victim to a fraud scheme. For example, Francis Cassady, a 70-year-old from Minnesota, thought that he had been hired for a remote job by a foreign company called SOTRAD. As his second assignment, he was told to cash a check from a customer company and mail the cash to a SOTRAD representative. As instructed, Cassady cashed the check (about $2,400), placed the cash in an envelope, and mailed it to "Artur Cole" at 1538 North Martel Avenue, Apartment 411, Los Angeles, California. Cassady did not place any invoice, contract, or other document in the envelope with the cash. Although the check initially cleared, it later bounced, and Cassady's bank deducted the fraudulent amount from his account. When Cassady's alleged employer asked him to repeat the task with new checks, he declined. SOTRAD never repaid him for the over $2,000 now missing from his bank account and never paid him a salary for the work he performed.

The same basic story repeated—with different employment companies and different aliases for Spila—for Jacqueline Pennington from Georgia, Andrew Kledzik and Daniel O'Connor from Florida, and Enze Bai from New Jersey. Each victim was hired for

remote work and received a check-cashing assignment. And each victim was instructed to send the cash to Spila's North Martel Avenue address. Fortunately, some of the victims saw through the scheme and declined to cash the checks. Pennington, for example, mailed the check to Spila's address with the name "Arturs Clare" instead of cashing it.

On the receiving end of those mailings, Spila served as a conduit for hundreds of thousands of dollars in cash from these victims and others. In the 83 days he spent in the United States, Spila deposited over $284,000 in cash across his three bank accounts and wired over $256,000 out of his accounts. Despite the large total, Spila never deposited more than $10,000 in cash in a single transaction—the amount that would trigger mandatory reporting. After he made the deposits, Spila wired nearly all the money from his account, often to international recipients, also keeping the transfers under $10,000. Spila deposited only one check: the one Pennington had mailed to him in lieu of cash, made payable to her name. Spila's bank accounts also showed no signs of legitimate business activity.

As he made these deposits and transfers, Spila communicated by email with Ivan Kanunnikov, who used the alias Jef Jordan in his Gmail account. The emails contained invoices "[f]or [f]lowers" and for "[p]ayment of services," and, despite purportedly coming from different companies, those invoices often had identical formatting. And the invoice amounts and descriptions often matched Spila's outgoing wire transfers. Kanunnikov in turn emailed Dmitrii Zherebiatev photographs, including at least one

photograph showing an envelope of cash addressed to Spila's first United States address, and receipts from wire transfers showing Spila's account information.

On April 5, 2022, a federal grand jury issued a superseding indictment against Spila on one count of conspiracy to commit money laundering, 18 U.S.C. § 1956(a)(1)(B)(i), (h). Spila pleaded not guilty and proceeded to trial.

Before trial, the government moved to authenticate several emails sent between Spila, Kanunnikov, and Zherebiatev as Google business records with a Google certification under Federal Rule of Evidence 902(11). Spila objected that the government was attempting to "authenticate an entire email . . . including substance and attachments." But, at the pretrial conference, Spila conceded that the emails "came from Google and . . . Google did not fabricate them nor did the government." The district court granted the motion to authenticate, but it clarified that the government would still have to prove that the emails' substance was admissible as not hearsay or under a hearsay exception.

At trial, the government introduced the emails, and Spila renewed his objection to the emails' authenticity and added objections for hearsay. The district court overruled the objections and admitted the emails and attachments.

The government then called Danie Saint Cyr, a forensic accountant at the Federal Bureau of Investigation, as a lay witness. Before she testified, Spila objected that the government had not disclosed Saint Cyr as an expert. The government explained that Saint

Cyr's testimony would "summarize the various types of bank transactions" in Spila's bank statements and would not "offer an opinion as to fraud." The district court allowed Saint Cyr to testify and informed Spila's counsel that he would "have to object" if her testimony crossed the line into expert opinion.

Saint Cyr's testimony explained her professional and educational background and that she had reviewed bank records from the Spila investigation and prepared analyses and charts. She explained that those documents "summarize[d] certain transactions, such as cash deposits, non-cash deposits, and outgoing wire transfer[s]" for Spila's accounts. She testified that Spila made 100 cash deposits. And her charts showed that Spila deposited $284,233 in cash in his three bank accounts and wired $256,506 from his accounts.

Saint Cyr also observed that none of Spila's deposits exceeded $10,000. When asked about the significance of this pattern, Saint Cyr explained that $10,000 transactions often trigger reporting. Spila objected that there was insufficient foundation for Saint Cyr's knowledge of this point, but he did not object to it as an expert opinion. Indeed, Spila did not object during Saint Cyr's testimony that any specific part of that testimony was an improper expert opinion.

Spila moved for a judgment of acquittal at the close of the government's evidence, and the district court denied that motion. The district court then instructed the jury on the elements of conspiracy to commit money laundering as follows:

Money laundering under . . . 18 U.S.C. [§] 1956 . . . occurs where a person knowingly conducted or tried to conduct a financial transaction, the person knew that the money or property involved in the transaction were the proceeds of some kind of unlawful activity, the money or property did come from an unlawful activity, specifically wire fraud, and the person knew that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds.

A conspiracy, as I've just used that term, is an agreement by two or more persons to commit an unlawful act.

. . .

To know that the money or property involved in the transaction came from some kind of unlawful activity is to know that the money or property came from an activity that's a felony under state, federal, or foreign law.

At closing, Spila argued that the government had not proved that Spila knew that the cash came from an underlying felony. Spila's counsel told the jury that there was "no evidence that anything was done that would be a felony under state[,] . . . federal[,] . . . [or] foreign law," and that the government "had to bring . . . evidence that a felony was in the works."

The prosecutor argued that although defense counsel "said that there was no evidence that the scheme here was a felony[,]

[w]ire fraud is a felony." Spila's counsel objected that no evidence supported this point, and the district court overruled that objection. The government continued to argue that the evidence established a fraudulent scheme:

> Receiving $280,000 through the mail in cash from individuals all over the country who have addressed their letters to people that are not you, to names that are not you, that shows you know that it's a fraud scheme because these people have nothing to do with you. They don't even know your real name, and they are mailing you cash with no explanation. You know they've been defrauded, and you know that that fraud is a felony. All of these facts show that the defendant knew that what he was doing was illegal.

Spila did not object to any of these statements or the rest of the government's rebuttal. But he moved for a mistrial based on the statement that "wire fraud is a felony" made at closing. The district court denied the motion.

The jury convicted Spila on one count of conspiracy to commit money laundering. Spila moved for judgment of acquittal and for a new trial on the grounds that the government had failed to prove Spila knew that the money came from a felonious activity and that the government's statement in rebuttal was improper. The district court denied those motions, entered final judgment, and sentenced Spila to 32 months in prison and one year of supervised release.

## II. STANDARDS OF REVIEW

Three standards govern our review. We review the sufficiency of the evidence *de novo* and "view all evidence in the light most favorable to the government, resolving any conflicts in favor of the government's case." *United States v. Watts*, 896 F.3d 1245, 1250–51 (11th Cir. 2018). We will not overturn a jury verdict "if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt." *Id.* at 1251 (citation and internal quotation marks omitted). "We review evidentiary rulings for an abuse of discretion." *United States v. Henderson*, 409 F.3d 1293, 1297 (11th Cir. 2005). And we review unpreserved evidentiary challenges and unpreserved challenges to prosecutorial misconduct for plain error. *United States v. Edouard*, 485 F.3d 1324, 1343 (11th Cir. 2007); *United States v. Hano*, 922 F.3d 1272, 1283 (11th Cir. 2019).

## III. DISCUSSION

We divide our discussion into four parts. First, we explain that the government presented sufficient evidence of Spila's knowledge that the cash came from unlawful activity. Second, we explain that the government's closing rebuttal involved no prosecutorial misconduct. Third, we explain that the district court did not abuse its discretion by authenticating the emails through the Google certification. Finally, we explain that the district court did not err in allowing Saint Cyr to testify as a lay witness.

### A. The Government Presented Sufficient Evidence to Convict Spila of Conspiracy to Launder Money.

Spila argues that the government failed to present evidence at trial that proved that "Spila or his co-conspirators *knew* that the conspiracy involved proceeds from a 'felony.'" But Spila misinterprets the elements of money laundering. To prove that Spila knowingly participated in the conspiracy, the government needed to prove only that Spila knew that the source of the money was some unlawful activity, not that he knew that it was a felony. The government satisfied that burden.

To sustain a conviction for conspiracy to commit money laundering, the government had to prove two elements: "(1) agreement between two or more persons to commit a money-laundering offense; and (2) knowing and voluntary participation in that agreement by the defendant." *United States v. Broughton*, 689 F.3d 1260, 1280 (11th Cir. 2012) (citing in part 18 U.S.C. § 1956(h)). The substantive crime of concealment money laundering in turn provides that a money-laundering defendant must have some knowledge that the property involved in his crime came from an illegal source:

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the

location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . shall be sentenced to a fine . . . or imprisonment.

18 U.S.C. § 1956(a)(1)(B)(i). And the statute defines the term "'knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity'" as requiring that "the person knew the property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony under State, Federal, or foreign law." *Id.* § 1956(c)(1).

Spila argues that a defendant must know that the underlying activity is a felony to have knowledge that the proceeds are from "some form . . . of activity that constitutes a felony." But a plain reading of the statute establishes that a defendant need not know that the money came from a felonious source. Section 1956(a)(1)'s knowledge element requires that the defendant know only that the money "represents the proceeds of *some form* of unlawful activity." *Id.* § 1956(a)(1) (emphasis added). And section 1956(c)(1)'s definition of that term reiterates that the defendant might not know "which form" of unlawful activity produced the money. *Id.* § 1956(c)(1). The defendant need not know the exact nature of the underlying criminal activity to be guilty of money laundering—or to knowingly join a money-laundering conspiracy. And if a defendant need not know the exact nature of the unlawful activity, he certainly need not know that the activity was a felony. That the statute does not require that a defendant know which crime produced the money necessarily defeats Spila's argument.

The Second Circuit has persuasively explained these two statutory provisions. Writing for our sister circuit, Judge Kearse stated that "[t]he first paragraph of [section] 1956(a)(1) is plainly crafted to distinguish between the actual source of laundered money and the defendant's knowledge as to the source of that money." *United States v. Maher*, 108 F.3d 1513, 1526 (2d Cir. 1997). That conclusion followed because "[t]he language of that paragraph requires proof that the laundered property 'in fact' involved the proceeds of 'specified unlawful activity,' . . . but it does not require proof that the defendant knew what that unlawful activity was." *Id.* If we interpreted the statute to require that the defendant know "the nature of the . . . unlawful activity," we "would nullify the careful wording of the first paragraph of [section] 1956(a)(1) which evinces the clear intent to reach a person who knows that he is dealing with the proceeds of 'some' crime even if he does not know precisely which crime." *Id.* As our sister circuit explained, section 1956(c)(1) confirmed that the knowledge element did not require the defendant to know which criminal activity produced the money because that subsection reiterated that the defendant need not know "'which form[]' of criminal activity" produced the property. *Id.* (quoting 18 U.S.C. § 1956(c)(1)).

This reading also comports with our precedents. We have explained that money laundering has four elements: the defendant (1) "conducted or attempted to conduct a financial transaction"; (2) "the transaction involved the proceeds of a statutorily specified unlawful activity"; (3) the defendant "knew the proceeds were from some form of illegal activity"; and (4) the defendant "knew a

purpose of the transaction was to conceal or disguise the nature, location, source, ownership, or control of the proceeds." *United States v. Majors*, 196 F.3d 1206, 1212 (11th Cir. 1999); *accord United States v. Tarkoff*, 242 F.3d 991, 994 (11th Cir. 2001); *cf. United States v. Frazier*, 605 F.3d 1271, 1281–82 (11th Cir. 2010) (discussing the elements of a section 1956(a)(1)(A)(i) charge). As the Sixth Circuit has explained, we would have to "conflate[ the] elements" to conclude that money laundering requires "knowledge of a felony." *United States v. Hill*, 167 F.3d 1055, 1066 (6th Cir. 1999) (internal quotation marks omitted). In other words, because the government need not prove that the defendant "knew that the property involved in the transaction represent[ed] the proceeds of a specific type of unlawful activity," it need not prove that "the defendant knew the precise nature of the unlawful activity; i.e., that he knew it was felonious as opposed to misdemeanor activity." *Id.* (citation and internal quotation marks omitted).

Spila alternatively contends that the jury instructions required the government to prove that he knew that the underlying crime was a felony. The government did not object to the instructions, so they constitute the "law of the case" and the government had to prove the elements of conspiracy to commit money laundering as outlined by the instructions. *See United States v. Spletzer*, 535 F.2d 950, 954 (5th Cir. 1976) (citation and internal quotation marks omitted); *accord United States v. Martin*, 803 F.3d 581, 590 (11th Cir. 2015).

The instructions were consistent with our interpretation of the money-laundering statute. The district court instructed the jury that "[t]o know that the money or property involved in the transaction came from some kind of unlawful activity is to know that the money or property came from an activity that's a felony under state, federal, or foreign law." This instruction restates the statutory language and requires the government to prove that the defendant knew that the money came from an unlawful activity and to prove that the unlawful activity is a felony. It did not require Spila to know that the unlawful activity was classified as a felony.

With that interpretation in mind, we conclude that the government presented sufficient evidence to prove each element of conspiracy to commit money laundering. Circumstantial evidence can prove the knowledge element of an offense. *See Frazier*, 605 F.3d at 1282; *see also United States v. Innocent*, 977 F.3d 1077, 1082 (11th Cir. 2020) (using circumstantial evidence to support the conclusion that the defendant knew that he had been convicted of felonies). The evidence of Spila's behavior allowed a reasonable inference that he knew that the money he deposited came from unlawful activities. Spila opened two bank accounts within days of arriving in the United States; he received over $280,000 in cash through the mail and deposited that cash into his bank accounts in amounts that never exceeded $10,000; the cash was not addressed to Spila's name but did use his address; Spila wire transferred almost all the money from the cash deposits out of his accounts, mostly to international accounts; and Spila received emails relating to his activities—often in Russian—from another person.

Taken in the light most favorable to the government, this evidence is sufficient to prove that Spila agreed to commit money laundering by (1) conducting financial transactions in the form of cash deposits and wire transfers that (2) involved proceeds of felonious wire fraud, with (3) knowledge that the money came from an unlawful activity and (4) knowledge that the transactions were meant to conceal the nature of the proceeds because his transactions never exceeded $10,000. A reasonable jury could find that Spila agreed to commit money laundering and knowingly and voluntarily participated in that agreement. *See Broughton*, 689 F.3d at 1280; 18 U.S.C. § 1956(h); *see also United States v. Duperval*, 777 F.3d 1324, 1337 (11th Cir. 2015) (holding that the receipt and deposit of "checks containing false memos" and the "disburse[ment of] funds . . . through withdrawals under $10,000," among other evidence, was "sufficient to prove that [a coconspirator] knew that the money was the proceeds of unlawful activity").

### B. The Government's Statement at Closing Argument Did Not Constitute Prosecutorial Misconduct

Spila next attacks a statement made during the government's closing rebuttal. As a preliminary matter, the parties dispute the appropriate standard of review. On appeal, Spila specifically objects to the government's rebuttal argument that the circumstantial evidence was sufficient to prove knowledge that the underlying wire fraud was a felony. But Spila objected *before* the government presented this argument. Spila's counsel interjected after the prosecutor stated, "Wire fraud is a felony." And, after trial, Spila's motion for a mistrial again argued only that the statement "that wire

fraud is a felony" constituted "[t]he [g]overnment . . . testifying to evidence." Based on this mismatch in arguments, the government contends that we should review the prosecutor's statement for plain error. Spila submits that we should review the misconduct *de novo*.

We agree with the government. Spila objects to a different set of comments on appeal and raises that objection on a different basis, so we review for plain error. *See Hano*, 922 F.3d at 1295 (noting that plain-error review applies because the defendant "did not object to *this* remark at trial" (emphasis added)). "For there to be plain error, there must (1) be error, (2) that is plain, (3) that affects the substantial rights of the party, and (4) that seriously affects the fairness, integrity, or public reputation of a judicial proceeding." *United States v. Foley*, 508 F.3d 627, 637 (11th Cir. 2007) (citation and internal quotation marks omitted).

"Prosecutorial misconduct requires a new trial only if we find the remarks (1) were improper and (2) prejudiced the defendant's substantive rights." *Id.* (citation and internal quotation marks omitted). During closing, "[a] prosecutor is expected to refrain from offering his personal views on a defendant's guilt or on the evidence." *United States v. Rivera*, 780 F.3d 1084, 1100 (11th Cir. 2015). But "a prosecutor is free to suggest . . . what the jury should conclude from the evidence before it." *Id.* So long as "the attorney makes it clear that the conclusions he is urging are conclusions to be drawn from the evidence," he may offer "inferences fairly suggested by the evidence or by matters of common knowledge

outside the evidence." *United States v. Johns*, 734 F.2d 657, 663 (11th Cir. 1984) (citation and internal quotation marks omitted). The prosecutor's comments "are evaluated to determine whether the comments so unfairly affected the trial as to deny the defendant due process when considered in the context of the entire trial in light of any curative instructions." *Parker v. Allen*, 565 F.3d 1258, 1273 (11th Cir. 2009) (citations and internal quotation marks omitted).

On appeal, Spila objects to comments that pointed to circumstantial evidence that Spila knew that the cash came from unlawful sources. And the prosecutor's arguments that the jury should find that Spila knew that the envelopes of cash with large sums of money from unknown people across the country came from unlawful activity "urg[ed] the jury to draw certain conclusions from the evidence." *Rivera*, 780 F.3d at 1100. The prosecutor was entitled to argue that kind of reasonable inference to the jury based on the evidence presented at trial.

And even if we looked to the prosecutor's comment that "[w]ire fraud is a felony," that comment was also proper. In addition to commenting on a reasonable inference from the evidence, prosecutors are also "entitled to make a fair response to defense counsel's arguments, and issues raised by the defendant in his closing argument are fair game for the prosecution on rebuttal." *United States v. Smith*, 928 F.3d 1215, 1232 (11th Cir. 2019). The prosecutor's comment responded to defense counsel's contention that there was "no evidence that anything was done that would be a felony."

Defense counsel's statement suggested that none of the activities were *in fact* felonies, not just that Spila may not have *known* that they were felonies. The prosecutor did not err in rebutting that statement.

Moreover, prosecutorial misconduct requires that the alleged misconduct affected the defendant's substantial rights despite any curative instructions the district court offered. *See Parker*, 565 F.3d at 1273. "[S]tatements and arguments" offered by a prosecutor "are not evidence," so "improper statements can be rectified by the district court's instruction to the jury that only the evidence in the case be considered." *United States v. Bobal*, 981 F.3d 971, 976 (11th Cir. 2020) (citation and internal quotation marks omitted). At the close of the trial, the district court instructed the jury that "anything the lawyers have said or will say is not evidence and is not binding on you," so Spila's argument that the statement "[w]ire fraud is a felony" constitutes evidence falls flat. "[E]ven if there were something wrong with the prosecutor's closing argument, the district court cured the problem, and the prosecutor's statements do not warrant a new trial." *Id.*

### C. The District Court Did Not Abuse Its Discretion by Admitting the Emails as Self-Authenticating Documents.

Spila contends that the district court abused its discretion when it allowed the government to admit the Google-certified emails as self-authenticating documents under Federal Rule of Evidence 902(11). The government offered certifications from Google representatives that the emails, which came from Gmail

accounts, were authentic documents. Spila argues that the district court erroneously authenticated the substantive content of the emails and their attachments, which Google did not write or create. We disagree.

For most pieces of evidence introduced at trial, "the proponent [of the evidence] must produce evidence sufficient to support a finding that the item is what the proponent claims it is." FED. R. EVID. 901(a). But for some evidence, this additional work is unnecessary. Federal Rule of Evidence 902 governs "evidence [that is] self-authenticating," that is, evidence that "require[s] no extrinsic evidence of authenticity in order to be admitted." For this evidence, the proponent need not submit additional evidence of the item's authenticity.

Original or copies of domestic business records that are accompanied "by a certification of the custodian" are considered "self-authenticating." *Id.* R. 902(11). A record may qualify for this special treatment only if it meets the requirements for a business record under Rule 803(6)(A) through (C). Rule 803(6) provides that a business record qualifies as an exception to hearsay if "(A) the record was made at or near the time by—or from information transmitted by—someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business . . . ; [and] (C) making the record was a regular practice of that activity." If a record satisfies these requirements, the certification establishes the document's authenticity, and the proponent need not offer additional evidence laying that foundation. *Cf. United States v. Deverso*,

518 F.3d 1250, 1256 (11th Cir. 2008) (discussing Rule 902(3)'s requirements for self-authenticating foreign public documents and explaining that "[b]ecause the [g]overnment met the requirements for self-authentication of the foreign document, it did not have to lay a foundation for admission of the document as a business record"). Importantly, authenticity does not equal admissibility. Instead, "authentication . . . of a document [is] a condition precedent to its admissibility." *United States v. Smith*, 918 F.2d 1501, 1510 (11th Cir. 1990).

The government presented certifications from Google that the emails were authentic. In other words, a Google employee certified that on a specific day, at a specific time, the recorded account sent the recorded message, along with its attachments, to the recipient account. The certifications stated, "The Document is a record made and retained by Google." They explained that "Google servers record this data automatically at the time, or reasonably soon after, it is entered or transmitted by the user, and this data is kept in the course of this regularly conducted activity and was made by regularly conducted activity as a regular practice of Google."

Spila argues that the district court "authenticated" the substance of the emails even though Google did not "create" that content when it authenticated the entire messages, including the message content and attachments. But Spila misunderstands the role of authentication under Rule 902. As the Fifth Circuit has explained, self-authenticating documents contain two "statements" for admissibility purposes: the first is the "email provider's

statement that one user wrote and sent a message to another user at the recorded time"; the second is the content of the emails. *United States v. Ayelotan*, 917 F.3d 394, 402 (5th Cir. 2019). The self-authentication provision does not absolve the proponent of the email *content* from the burden to prove that the statements it contains are admissible. *Id*. It instead relieves them of the burden to lay the foundation supporting the authenticity of the record.

The district court did not err in authenticating the emails based on the Google certification. Google kept records of the addresses, accounts, timing, and contents of the emails sent using its server in the regular course of its business. That attestation satisfies the requirements of Rule 902(11). And Spila does not argue on appeal that the contents of the emails offended any other rule of evidence. The district court did not abuse its discretion.

### D. The District Court Did Not Err in Permitting the Forensic Accountant to Testify as a Lay Witness.

Spila next contends that the district court erred in allowing a forensic accountant to testify as a lay witness. The parties again dispute the standard of review. Spila argues that we should review for an abuse of discretion. The government counters that we should review for plain error.

We agree with the government. Spila made only a general objection that Saint Cyr had not been disclosed as an expert. That objection failed to preserve his specific arguments on appeal that her testimony about "the bank records analysis that she conducted," the exhibits she created, the charts she prepared, and the

information she explained about those charts constituted expert opinions. When a party fails to make the specific objection he challenges on appeal or to "move[] to strike any of [the] problematic testimony[,] . . . [t]he plain error standard . . . applies." *United States v. Hawkins*, 934 F.3d 1251, 1264 (11th Cir. 2019) (explaining that a party failed to object to improper expert testimony except for "tepid objections" that "were not sufficient to preserve the issue of the propriety of [the] testimony").

The standard of review matters little here because Spila cannot show error under either standard. In *United States v. Chalker*, this Court stated that lay witness opinions are those opinions that are "'rationally based on the witness's perception'; 'helpful to clearly understanding the witness's testimony or to determining a fact in issue'; and 'not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.'" 966 F.3d 1177, 1191 (11th Cir. 2020) (quoting FED. R. EVID. 701). "Notably, Rule 701 does not prohibit lay witnesses from testifying based on particularized knowledge gained from their own personal experiences." *Id.* (citation and internal quotation marks omitted). Testimony based on professional experience that does not require specialized or technical knowledge can be considered lay testimony.

*Chalker* forecloses Spila's argument. There, the defendant challenged the admission of lay opinion testimony from a forensic accountant at the Federal Bureau of Investigation who, after describing her education and job experience, "provid[ed] the jury with a summary of [the defendant's] bank and wage records" and

did not stray into the defendant's conduct or any opinion about the records. *Id.* at 1191–92. We held that none of her testimony "impermissibly crossed over the line into expert testimony." *Id.* at 1192; *see also United States v. Hamaker*, 455 F.3d 1316, 1330–32 (11th Cir. 2006) (concluding that analyst testimony, assisted by charts and exhibits, "simply reviewed and summarized over seven thousand financial documents" and did not "express any expert opinion").

So too here. Saint Cyr's brief testimony covered her education and experience, described and explained six charts that she created about information from three bank accounts, and offered basic descriptions of how bank transfers work and the records that correspond to those transfers. Only once did Saint Cyr potentially stray beyond describing what she reviewed during the investigation into Spila: when asked why the absence of $10,000 transactions was significant to her review, Saint Cyr explained that a transaction over $10,000 must be reported. Spila objected that the government had not laid a sufficient foundation for that statement. The government then clarified that Saint Cyr's job required her to have familiarity with these transaction reports. Like the testimony of the accountant in *Chalker*, this testimony about Saint Cyr's organization of the data involved no expert opinions. Spila fails to establish any error. *See Chalker*, 966 F.3d at 1191–92 (finding no "clear abuse of discretion" in the admission of lay testimony).

## IV. CONCLUSION

We **AFFIRM** Spila's conviction.